1530030, Darren Kenny Lewis, Sr. v. Ascension Parish School Board. First we'll hear from Mr. Percy. Good morning, Your Honors. Ryland Percy on behalf of Darren Kenny Lewis and his sons. As you're aware, this case involves a re-apportionment of the schools on the east bank of the Mississippi River and Ascension Parish. And I know you're very familiar with the record and you know what happened. Where we are today is, if you would assume that Plan 2B, as implemented by the school board, contained no reference to race and was strictly a series of maps, demographic data, that type of thing, what they now call today 2B, if you assume that that's what was considered by the school board and voted on on the night of January 15, 2008, then I've got a real problem. That's what happened in the Marion case. That's what happened in the Spurlock case. But isn't that what we have here? Didn't they go by boundaries to try to equal out things and go by addresses and boundaries and say, OK, these people that live on this side go here and people that live on this side go to this other school and work out that way? Ultimately, after the vote, I would refer you to Joint Exhibit 1 and Joint Exhibit 2. Prior to the night that they voted and on the night that they voted, these are the only charts that were ever presented to the deliberative members, the school board members, in order to make their distinction between the various alternatives being offered. These are the only charts, and that's in the evidence, and those are findings of fact by the judge. This is what they voted on, and if you look at this document, it is purely demographic data. There are no streets here. There's nothing like that. All it says is total enrollment, the population affected, the minority percentages, and the at-risk percentages. It's pure demographics. It's not geographic. After the fact, now somebody knew what the streets were because they put these numbers in here, but the deliberative members, the school board members, they weren't discussing streets. This wasn't like Lower Marion where school board members rode school buses and actually went to see how far these kids were from school or anything like that. None of that happened. If you look at the record, none of that happened in this case. All of the discussions by the school board members related solely to these two charts. The first chart, number one by Mr. Gautreaux, laid all out a whole number of different options, and when he laid it out, he didn't talk streets. He didn't talk geographics. He talked demographics. How many black people are we going to affect? How many at-risk students are we going to affect? Well, that seems to get to maybe the discriminatory purpose, which the district court didn't have to get to, but to say that looking at what the policymakers were relying on makes it a facial racial classification, that means in every case we'd have to be looking at what individual policymakers are relying on. When you get to a much bigger body than a school board, say a state legislature, you've got hundreds of people, and courts would have to inquire into what all these different members were relying on when they voted for a plan that on its face doesn't select by race? Well, Your Honor, I would go beyond this, and let's go to the testimony of the school board members themselves as to what they were deliberating on and relying on. We are going to have to look in each case on this fact-bound analysis of what people relied on, not just what the policy ends up looking like. That's correct, Your Honor, but there was no evidence. There was no evidence at the trial that they relied on anything other than the demographic data. As a matter of fact, when you look at the quotes that we cited, they talked about moving black people, and they talked about unitary status and things like that, which is not something that you can rely on based on the Seattle case. Well, they certainly relied on the number of students at the school, right? I mean, that was the whole motivation was to reduce overcrowding at that one school, so weren't they looking at the number? That was the initial impetus for the change to start with. That is correct. But once again, they looked at the numbers of the school. What did they do, Your Honor? And they knew they were doing it because this was pointed out to them. Dutchtown High School, the pride of Ascension Parish, has a feeder system. It has one Title I school, one. East Ascension has a 100% feeder system, Title I school. So what did they do? They looked at the demographics, they looked at everything, and they turned around and they moved the one Title I school from Dutchtown. It's now a very pristine system. They don't have these challenges. And they moved that one Title I school into the East Ascension feeder system. So not only is it continues to be 100% Title I throughout, they have now put more at-risk students in there. And this directly affects the educational opportunity of those kids in that classroom. No, and I think you raise, and the way it happened right after the change to unitary status, I think there's a lot maybe to be concerned about here, but I'm just not sure how you get to this being an express facial racial classification. I mean, the state of Louisiana, the legislature redistricts its legislative seats. They're looking at reams and reams of demographic data every time they do that, and the Supreme Court has never said that makes it a racial classification. So how do you get around the political redistricting case? All I can tell you on that, Your Honor, is the night they voted and the document they looked at and the document they voted on and the choice they made was based on this document. If there was another document that showed streets and all about those other issues, if it existed on that night, I don't think it did. If it existed on that night, there's no evidence that it even existed that night. There's no evidence that it wasn't created after this meeting once they decided how to divide up the blacks and whites and the at-risk kids. So in a political redistricting case, the plaintiff challenging that would be able to depose every member of the legislature and say, what were you looking at the night before you vote? I mean, maybe that's the right answer. I'm just trying to figure out how this applies. No, Your Honor, I think the way it applies is if you look at the way they did it in the other cases, the other two, Marion County and Spurlock, they did it correctly. They went out and they looked at all of those other factors and they made them a part of the plan and they debated them and when the deliberative body sat down and looked at everything, all of these factors were there. They looked at cost. They looked at distances. They rode school buses. They looked at geography. They looked at diversity as a part of it. It was a part of it and I think appropriately it should be. They looked at educational quality. If all of these things had actually taken place objectively in Ascension Parish on the night of January 15th and before, and if it had been done like Spurlock, if it had been done like Marion County, I wouldn't be here tonight. I wouldn't be here tonight. I wouldn't have a case. But that's not how it was done. That's not how it was done. And whether you're looking at strict scrutiny, because I say that this is the plan that was voted on and it has race-based distinctions on its face, whether you look at it there or whether you look at it under another standard and you start looking for discriminatory intent, there I would reference you to the various quotes where every school board member who testified, it's clear from the testimony, racial balance, unitary status, all of that was a prime concern. You also have to look at the fact that they destroyed evidence. This was not even discussed by the trial court. It's funny, isn't it? You said that you did not, is it true that, I thought I saw somewhere, you do not contest the district court's findings of fact? I didn't, Your Honor. You're bound by the factual findings of the district court? Yes, Your Honor, but if you read the factual findings, he says what I just said as to what took place at that meeting and before. Way down, five or six findings later, he says, but the plan is the plan is the plan and that's the plan that was introduced at trial later. No evidence that that plan even existed the night. He doesn't say that's the plan that was voted on. He doesn't say that was the plan that was adopted. That's the plan that was implemented and I don't know how he made that jump, Your Honor. I really don't and he doesn't cite me like that. But isn't that a factual finding? If he says that the plan did not have a racially discriminatory effect, isn't that a factual finding by the court? But the plan he's referring to is the subsequent plan that was adopted later. If he's saying that the plan that was adopted this night didn't, then I would disagree. I would disagree. My point there was that the plan that, if that plan existed, it was somewhere in the bowels of the school board and the school board members weren't looking at it and discussing it. Those maps didn't exist at that time. They weren't drawing maps for 22 different plans and throwing maps everywhere. They were just giving demographic numbers. They were just giving demographic numbers. And when you look at what happened, the effect is clear. When you look at the widening gap, the widening achievement gap, when you look at what's going on in Ascension Parish, East Ascension High School, now they'll say it's improving, improving, improving. But if you look at the numbers, well, that's great. We should be real proud. East Ascension's getting a little better and Dutchtown and Santa Monica are taking off and the gap is widening all the time. But we should be happy. We're the majority minority school. This is okay. We're doing better all the time. They're giving us extra teachers. They're doing all of this other stuff. But they can't address the real problem. And Dr Bates talked about this problem. The judge shuffed him off. We're talking Dr Bates, University of Michigan. He was one of the moderators in the Baton Rouge desegregation case. He was the expert they brought in and he shuffed him off. And he testified as to the detriment to the students in a classroom when you've got more than 40% at-risk students in the classroom. He said learning really does not go on. It's babysitting. I read the district court's opinion and based on my review of the record, which isn't as thorough as yours, to say that there wasn't an expert testifying on a comparative basis. I think it's clear that this school is lower performing than the other high schools in the district. But to show that this plan has a disparate impact, it seems like there needs to be a comparative inquiry of here was the gap before and now the gap, as you said, is widening. Can you point me to that? Explain that testimony to me. That was in the record. First of all, in Louisiana they have what they call SPS scores, school performance scores, and they come out every year. And what we showed at trial was, yes, all of them improved. All of them improved, but as I said, the gap widened. The gap widened, and there's a natural grade inflation. Beyond that, I'm sure you're going to hear that East Ascension is an A school. Well, this is Louisiana. And in Louisiana, a 60% score is an A. Now, I don't know of any other system in the world where 60% is an A, but when they tell you A, please remember 60%. That's what we're talking about. And once again, it gets back. Yes, they're wonderful teachers at EA. They kill themselves. They do the best they can. They have great students. They kill themselves. But they're facing insurmountable odds that are not being faced by the students at Dutchtown or Santa Ma. The majority, but dominantly, white schools. And when they had a chance to fix it on that night, they did just the opposite. They did just the opposite. They turned around and moved all of these at-risk students and enhanced the minority numbers so that when you went from 38%, 39% today, we predicted it. We predicted it that you would be over 50% and within a very short period of time, you would have a predominantly minority school and a predominantly at-risk school. And those are not the same things in Ascension Parish, in Gonzales. We have a very strong minority community that is financially capable and educated. When we talk about the at-risk students in the East Ascension system, quite a few of them are the white students. So there's a difference here. And our whole case is based on that this was a discriminatory act, and a known discriminatory act because they were warned. It was a discriminatory act when they loaded up and enhanced the number of at-risk students in that school, the school that was already the largest minority school, and with what they were doing was soon to become a predominantly minority school, and everything we predicted has happened. Do the cases involving electoral boundaries and deciding electoral districts and boundaries, do those cases apply in this particular case? Do we look at them the same way? Do those have some influence or effect on how we should look at your case? I don't think so, Your Honor, but I'm really not qualified to answer that question. I don't think it is. I don't think it is. Why are those different? Well, I guess they're not different in the way you're talking about electoral rights versus your right to an equal education with other students. So in the sense that you're affecting equality or hurting equality, I do think they would apply in that sense. It just seems like they just seem somewhat different to me. Do we use those as some sort of guidelines to interpret how we should look at this case with regard to boundaries? We're looking at school district boundaries. In those cases, we're looking at electoral districts and deciding whether there were too many or not enough minorities in situations of that type. So do those cases help us in deciding your case? Your Honor, I think I've already said, when you go back and look at the Lower Marion case and the Spurlock case, those courts made clear that having race or balance as a factor to be considered is not inappropriate, and I would agree with that. My problem here is this was the predominant factor, and it was, in fact, what was voted on. It was the issue voted on that night. And so I think you could look to the electoral cases... The results of the boundaries, but those aren't the boundaries. That's right. So they voted on the boundaries which were geographical, not on we're going to have so many percentages of each one, but they decided the boundaries, and if you look at the boundaries, they're race-neutral. But, Your Honor, they didn't look at the boundaries. At that point on that night, the boundaries were located in a computer, the edgelog system, and some computer guy said, if we do this, we do this, we do this, and the numbers would just come over and flash up. That's what would happen. They had no idea which streets they were talking about when they looked at 2B. So these streets weren't even printed out and shown to them until later. They were just looking at these demographic numbers, and I think that's what's precluded by the Seattle case, and for that reason... You know, counsel, I'm listening to this argument. I was on the panel in the Seattle school case. That board worked to deal with the object you're interested in, but they wound up with residents. What's the Supreme Court going to do with a case where every assignment of non-whites is because of residents, where they live? What's the Supreme Court going to do with that? Well, Your Honor, I don't think that's the case here. That's the finding. What finding? That every assignment was because of... No assignment was away from where they lived, residents. OK. Your Honor, you know, I'm not the decision-maker, I'm not the policy-maker. People have asked me, what would you do if you could fix it? And I say, well, perhaps in today's world, perhaps in Ascension Parish, we need to quit using boundaries and start looking at other ways to arrange participation in schools, and that may be the world we're getting to, and that may be what we have to do to provide our children effective educations. I mean, the problem of at-risk students in classrooms... It's a terrible problem. It's a terrible problem, and I'm standing here today because our school board specifically made it worse for the school system or the subsystem in Ascension Parish that was predominantly minority. Thank you. Thank you, Mr. Perkins. Ms. Dill. May it please the Court, good morning. Well, Your Honor, my name is Pamela Wescovitch Dill. I represent the Ascension Parish School Board. I'm joined here today by Ms. Angie Parraza, who is representing the superintendent. The superintendent is not here today because it is the most important day of the year. In Louisiana, it's back-to-school day. And in Ascension Parish, today there are over 21,000 students who have reported to their assigned schools. These kids, each of those over 21,000 kids, have reported to one of 28 different schools based solely on where they live, not because of their race, whether it be black, white, Hispanic, Asian, American, Indian. We have a lot of races in our parish. And whether you're a good football player doesn't... Hopefully not, Your Honor. But you know it is Louisiana. So, football ability and baseball ability makes a lot of difference. In any event, this school year is the eighth consecutive school year that Option 2F will be applied. In 2008, as counsel opposite stated, 2F was a boundary-driven plan for student assignment that was adopted. They filed a lawsuit about four months later or so. They never sought a preliminary injunction, even though they raised nine different causes of action. This plan has been in effect ever since.  is when we get to the point where we need to talk about similarly situated persons being treated differently or whether there was discriminatory impact. In the six years that had occurred at the time we came to trial, they only came up with three little things that they wanted to point to to prove that they were treated differently. You know, like any appellee who has been successful in district court, we're not happy to be here. But after receiving the request from the panel for the 28J letter last week, I took the opportunity to review the standard of review issue. And I believe that what we have here is a prime opportunity for this panel to set something straight for the circuit. And listening to the argument of counsel opposite, I think it's even more clear at this point that he is arguing to this court that we need to look at ultimate facts and this court needs to reweigh those facts. He even goes so far now for the first time suggesting that this court should look again at whether the district court properly judged the credibility and reasonableness of the judges... Excuse me, of the experts' testimony. This is not what this type of case is here for. I in particularly studied the recent Aransas Project case. I think I mentioned that in my letter brief that I gave to you. And I compared the original opinion with the modified opinion and then I looked with real pleasure, actually, at Judge Prado's dissent on the en banc denial. And I believe that your warning there is exactly what we have here. I believe that Mr Lewis has heard the message that was sent by that opinion and a lot of others. And I'm going to read the words that you said because I think they're perfect here. If you don't like the trial court's finding, the Fifth Circuit doors are wide open to endless retrials or appeals. Did I say that? You did. Judge, you said that those cases, the Aransas and those cases where the Fifth Circuit panels have looked at ultimate facts and instead of applying the real clear error standard, which is supposed to be applied under 52A for ultimate fact questions, they engage in a balancing, a reweighing, and they're substituting their decisions, which is not the correct way to apply clear error standard. In this particular case, I think we have the chance for this panel to actually shut that door and not to just talk the talk, which I think is what happened in the Aransas project and some of the other cases, but to actually walk the walk for clear error review. And that is to look to see whether the trial judge has determined these factual issues such that there is a preponderance of the evidence produced to support that issue. Sure, you may say, you know what, I may not have decided it that same way on these facts, but that's not the role of the circuit court in a clear error standard of review. I mean, when you look at the Pullman standard and its progeny, the Supreme Court specifically said there is no distinction in 52A between ultimate facts and subsidiary facts. It's still a fact question, and what we have here, similar to proximate cause being a fact question to discriminatory intent being a facts question, every element that was addressed and found dispositive by the trial court are fact questions. Those questions were absolutely ignored by counsel opposite in his argument a few moments ago. Beyond the factual findings of the district court, what effect or impact does the ruling of the first panel have on the issues here? Are we bound by any part of the first panel that obligates this court to follow what their decisions were in that first case? I'm going to refer to it as Lewis I, if that's okay with you. Lewis I was a decision made on a summary judgment review, so it was a de novo review. The most favorable view of the plaintiff's case was given at that point. They remanded a very narrow issue, the same issue that's before us here today, that was the only substantive issue that was remanded, because they found a dispute of facts with regard to discriminatory intent and discriminatory impact. They made some statements with regard to parents involved and reached some conclusions, at least the per curiam opinion did, which didn't really lead to any conclusive statement. I don't believe, and I would submit to you, that none of that dicta is binding as far as the impact of parents involved. The parents involved case is not this case. We do not have specific individualized racial classifications which say this kid must go to this school because of their race. As a matter of fact, and this may be a good time to point this out, even the exhibits that Council Opposite gave to you this morning, the statistical analysis, that was prepared by the superintendent, and it shows a comparison of several different plans, and it doesn't have anything that would be useful in assigning students to schools. It just has broad percentages. So that's just an awareness of demographics. It's nothing that... Even if it were attached to what the court definitively found to be the plan, there's nothing there to assign kids to the various schools. So I believe that that's totally irrelevant to the determination of explicit classifications. But to get back to my point, this is not a parents involved case. It's interesting that Council Opposite, on behalf of the plaintiff or the appellant, has admitted that he does not disagree with any of the fact findings. If he doesn't disagree with any of the fact findings, why are we here? Because the fact findings were rich. They were broad, they were expansive, they were very specific, and those fact findings specifically supported the ultimate finding of fact which resolved each of these issues. I want to point out also that, under the Pullman-Standard-Swent case and its progeny, the only time that an assertion of fact, a lower court's factual findings on the ultimate issue, can be disturbed, if it's supported, is if there is a misunderstanding of the legal standard or if there's an assertion that he applied the wrong legal standard. In this case, if you read their blue brief and the reply, there is absolutely no allegation that the trial court applied the wrong standard. As a matter of fact, Council Opposite has cited the exact standard of law that the trial court cited, with the exception of one little element which is really not determinative at this point. So, for each and every one of these individual elements of the equal protection test, you have a factual determination, under the correct legal standard, that they just want you to re-weigh. Your Honours, this is a political challenge. They don't agree politically to this particular student assignment plan, which has now been in effect for eight years. You say we're supposed to review this. Your position is that we should review this under a rational basis review. What legitimate government purpose is accomplished by this? 2F, what is the plan? Option 2F. The appellant agrees, and it is undisputed throughout the record, that this plan was developed after a long period of time in order to address overcrowding in the Dutchtown school zone, which borders the East Baton Rouge area. It just was exploding. It exploded so much that they had to take the gym in the middle school and put up dividers to make classrooms. So the purpose is undisputed. They were trying to even out the student populations. The record shows that at the time, I believe, the difference in population was 500 or 600 students between Santa Monica and Dutchtown and EA. After the implementation of 2F, that was accomplished. At this point, we now have pretty much balanced overall student populations, and so overcrowding is the rational basis. It does seem from looking at the statistics that the number of at-risk students is going up at East Ascension, that the standardized test scores like the ACT are showing a drop. How was the district court able to find no discriminatory impact with those kinds of numbers? Well, there are two issues at play here. First is, and I haven't even been able to address the similarly situated issue, but we rely on the information we've presented to you. But with regard to treated differently and discriminatory impact, they pointed to three things. They pointed to a one-year report of the ACT scores. Those scores were 19.4 for EA, 20.3 and 21.3, less than a two-point difference for one year. Advanced placement, they gave two years, and for one year of just the students who took advanced placement testing, there was one year where EA students had a smaller percentage of passing. Then the student performance scores, they claimed that there was a gap between these three feeder systems. That gap existed before Option 2F took place. What about the percentages? I mean, it does seem there's increased segregation now that East Ascension is getting heavier minority percentages and the other schools less. Isn't it having some sort of resegregation effect? Well, Your Honor, let me address that head-on. This case is not about racial balancing. The case before you is not about resegregation. That claim was specifically dismissed and waived. It was not addressed on the last appeal, Lewis 1. They did not raise that claim in their pretrial order, in their summary judgment motion before the trial court. The trial court didn't address it. They didn't even raise that issue again when they tried to raise it to salvage their case here. Anything to do with racial balancing that they have presented to you is wholly irrelevant. And that would be my response to you about that issue. What about the at-risk percentage? The at-risk percentage, which is the heart of their claim, is increasing at East Ascension, seemingly not at the other schools. Well, it actually is. The increase we presented evidence to show, and the record will show that, the increase in at-risk students, the percentage increase was actually greater at Dutchtown or Santa Monica than it was at EA. All of them have increased, and the projections did show an increase. But here's something interesting. If you look at these numbers, the projections that they want you to think as part of Option 2F, the projections actually showed that the percentage of at-risk students was going to decrease from the current plan that they had. So if you compare what they currently had and if they were to run along keeping that same plan and they adopted Option 2F, of course the number of students receiving free and reduced lunch, and that's what we're talking about, are going to increase. They increased at every school. But the projection showed that it was going to decrease from what their current plan even was. And the statistical analysis that they're claiming as part of Option 2F, if they did vote on that, if that was the reason that they voted and there was no evidence that that was a basis for their vote, it shows a decrease in the percentage of at-risk students at EA from the current number. I think the current number was 40% and the superintendent's projection showed it dropping to 37%. To me, that suggests that, oh, well, that's going to decrease the number rather than increase the number. I did want to point out about the discriminatory impact, treat it differently issue, that the judge's findings specifically stated that the board members were in possession of that statistical analysis that the superintendent did. They were in possession of it the night they voted. Four of six of the members were aware of general racial demographics. Some of them, he knew about Gotro, who is, by the way, the man who prepared the two-page projections you have there. He is a member of the board who voted against Option 2F. Some of them didn't even remember ever seeing it at all. So the judge concluded that he couldn't even be certain how many of them even saw it or were aware of it, much less considered it. There was no evidence that any board member actually considered this information when they voted to adopt this student assignment plan. I think that's very important. And he kind of sloughed off the importance of the increased educational or academic success of the EA system. You can't slough off increased academic success. This whole argument that he makes is that having these at-risk kids are hurting us. I heard Judge Reveley say the other day to one of the attorneys arguing, well, how did you get hurt? I think that's the same question that needs to be asked. How were you hurt? How did these three simple statistics hurt you? I think looking at the statistics I've looked at, I don't think there's any doubt East Ascension is the lowest performing school in the district. Now whether this plan increased that maybe wasn't proved. But let me, on the similarly situated, which you said you wanted to touch on, the district court judge, as I read it basically, and I'm not even sure similarly situated applies in a case like this, and I think you make that point in your brief, but if it does, the district court says, well, the minority students can't show that similarly situated people of a different race were treated differently because there's some white students at East Ascension. Isn't the comparison other students in the district? I mean, that would basically mean if you did have some plan that was pushing, making a school 99.9% minority and you had that one white student there that you couldn't show similarly situated, I mean, how do you defend that analysis? Well, I believe that that's a wholly different ball game when you get to the scenario that you pointed out, and I understand that that was one of his arguments. However, what we have here is we have a feeder pattern, at least let's talk about the high school because that's where all the kids eventually end up. We have a high school that has 48% white students, and he's claiming that only the minorities are being adversely affected, discriminatorily impacted by the presence of at-risk kids. Even his experts said all students at a school that has a high number of at-risk kids are impacted adversely. Of course, most of his testimony was rejected by the court as having no foundation. But it's the most heavily minority school. It is, but there is a distinct line of cases from the Supreme Court and otherwise in this jurisdiction that says an equal protection case cannot be based on a predominant effect. Just because a predominant amount of a race is affected, that's not an equal protection case. The heart of an equal protection case is that there is a person of an opposite race who stands in the same position with you, has to be treated differently. What is more standing in the same place as you under Option 2F, under a student assignment plan, than the white person who sits in the desk next to you? How can that not be more similarly situated? Now, I don't have a problem, really, with talking about the students at Dutchtown and at Santa Ma. However, there are black students there as well. So I think it's difficult, would be difficult for the court to resuscitate this absolutely what I believe is a DOA on the equal protection element. The fundamental proof that he has to show is that some white person was treated differently, that there was a similarly situated white person treated differently. If I've got white kids in the same class as me, how can I be treated differently than them? And I believe that upon testimony at trial, the court clearly saw that and recognized that based on this evidence, there's no other way that I can answer that. I think I'm out of time. Any other questions? Thank you. Mr. Percy, yes, sir, you have five minutes. First of all, Your Honor, she talked about percentages and at-risk and that between the high schools. You know, they say numbers don't lie, but we have some other things going on. Well, of course, the percentage at East Ascension, they started with a larger base number. So their percentage of growth is going to be smaller on a percentage basis when you have schools that have almost no at-risk students and they get 10 more, they may have a 25% increase. EA can get up 48 more and only have a 2% increase because they're starting with a larger number. So that's deceptive. Back to talking about the whole geographic district thing, what struck me as I was sitting there listening to her was that all you have to do today is use whatever basis you want and make what changes you want and then at the end of the day, wrap it in a geographic line and then formalize it in the form of geographics. And guess what? You've just killed any civil rights claim because you did it on geographics. And that's what happened here. The decision was not made based on those geographic lines. After the decision was made... You just mean it's not a facial classification, but then you can still prove purpose and intent, which you had a full trial prove and you just didn't convince the judge. You wouldn't kill every civil rights claim, right? Yes, Your Honour. And when it comes down to it, when you look at the scores, you look at the ACT scores, you look at the SBS scores, and we have a wonderful school board PR department and if you read the local newspaper, we've got the greatest schools in the world. Dutchtown's a really good school. East Ascension's below average. East Ascension is getting worse. And that's just a fact. And if we can't come to this court and hopefully get some kind of relief, then the civil rights program in this country has a problem. Thank you. Thank you.